U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2013 OCT 24 PM 2: 34

CLERK
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA )
)
v. ) Case No. 5:13-cr-38-cr-1
)
RASON BATTLE )

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, GRANTING DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE, AND DENYING DEFENDANT'S REQUEST FOR *FRANKS* HEARING AS MOOT
(Docs. 36 & 37)

This matter came before the court on September 4, 2013 for an evidentiary hearing on Defendant Rason Battle's motions to suppress statements and physical evidence. (Docs. 36 & 37.) The parties completed post-hearing briefing on September 13, 2013, at which point the court took the matter under advisement.

Defendant is charged with knowingly and intentionally possessing heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Defendant seeks suppression of all physical evidence seized pursuant to a search warrant from a dwelling in which he was an overnight guest, arguing that: (1) the search warrant did not describe the place to be searched with sufficient particularity; (2) the search warrant affidavit failed to justify the no knock, nighttime search warrant; and (3) the search warrant affidavit inaccurately recites certain material facts, and without those facts, the search warrant was not supported by probable cause because the reliability of the confidential informant(s) was not established. Defendant requests a further evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) to establish that the alleged material misstatements of fact contained in the search warrant affidavit were intentionally or recklessly made. In such event, Defendant contends there can be no good faith reliance on the search warrant. Defendant also seeks to suppress his post-arrest statements, arguing that law enforcement

continued to question him after he invoked his right to remain silent and his right to counsel without a valid waiver of his *Miranda* rights.

The government opposes the motion, asserting that the search warrant describes the place to be searched with sufficient particularity and that although the search warrant affidavit was "difficult to follow and used imprecise language" (Doc. 45 at 1) in its description of confidential informants, it provided sufficient reliable information to support a finding of probable cause. The government further argues that law enforcement reasonably relied upon what appeared to be a facially valid warrant, and the exclusionary rule does not bar evidence seized in violation of the knock and announce rule. The government contends that a *Franks* hearing is not warranted because any inaccurate factual statements in the search warrant affidavit were not material to a finding of probable cause. Finally, the government contends that Defendant waived his right to remain silent by initiating further communication with law enforcement, that he did not unambiguously invoke his right to counsel, and that his course of conduct established a *Miranda* waiver.

The government is represented by Assistant United States Attorney Michael P. Drescher. Defendant is represented Kurt H. Hughes, Esq.

## I. Findings of Fact.

### A. The Search Warrant.

On March 14, 2013 at 10:38 p.m., a Vermont Superior Court judge issued a one-page search warrant authorizing a ten-day window for a search of a residence for "[a]ny evidence of criminal violations involving the sale and distribution of regulated drugs, that evidence includes regulated narcotics [and other evidence of drug distribution]." (Doc. 45-1 at 1.) It also permitted a search of "[a]ll individuals located inside the residence at the time of the warrant to identify the individuals present and search them for weapons and/or contraband[.]" *Id.* The warrant states that it is being issued "With No time of day Limitation[.] Also requesting a NO KNOCK and ANNOUNCE exception be allowed for officer safety[.]" *Id.*

The face of the warrant indicates that it was issued in and for Chittenden County. The warrant contains a description of the place to be searched, but does not indicate the town or city in which it is located. It authorizes a search of:

> The residence of Joshua Puma DOB [ ] located 39 Twin Oaks. This residence is a condo located in the second building of the Twin Oaks Terraces. The building is dark green in color with beige shutters. This is a multi unit building and 39 is located in the center of the building and is clearly marked. To access unit 39 you enter into the building and 39 is on the bottom floor with the door being on the right side.

*Id.* The government presented no testimony from a law enforcement officer executing the warrant regarding whether he or she knew the town or city in which the residence was located.

The law enforcement officers who testified at the court's evidentiary hearing conducted surveillance of the residence, but did not participate in the execution of the warrant. They conceded that unit 39 is not in the center of the building. A Google Earth map introduced into evidence as Defendant's Exhibit E supports a conclusion the residence is also not in the "second building of the Twin Oaks Terraces." A photograph of the building, introduced as Government's Exhibit 1, reveals that the building appears to be blue-gray in color with white shutters, not dark green with beige shutters, and that a range of unit numbers are depicted over the entry way which include, but are not limited to, unit 39. No party introduced evidence that the address "39 Twin Oaks" is or is not unique to Chittenden County, although the government argues this point in its Opposition.

## B.    The Search Warrant Application and Affidavit.

Winooski Police Department Officer David Nease, who was the affiant for the search warrant application, did not testify at the court's evidentiary hearing.[1] His March 14, 2013 application for the search warrant omits the town or city, as well as the county,

---

[1] In his affidavit, Officer Nease identifies himself as a current Winooski police officer and a former "member and a supervisor of the Vermont State Drug Task Force from 1994-2004, and again from 2008-2010." *Id.* ¶ 1. He does not indicate why he was chosen as the affiant.

in which the residence to be searched is located. The application tracks the search warrant's description of the place to be searched, including its inaccuracies.

Officer Nease's search warrant affidavit, also dated March 14, 2013, was not appended or otherwise incorporated into the search warrant. It, however, twice states that 39 Twin Oaks is located in the City of South Burlington.

The search warrant affidavit contains eighteen paragraphs of information, several of which contain subparagraphs. The majority of the information set forth therein is derived from other law enforcement officers. With regard to his personal knowledge, Officer Nease avers the following:

> On March 5th, 2013 Officer Adams and I met with a Cooperating Individual that produced 3 bags of heroin that it advised was given to it by Rell [identified elsewhere in the affidavit as the Defendant]. The suspected heroin was seized as evidence. The CI stated that the heroin was given to it for providing a ride to Rell. The CI was counseled that it was against the law for it to be in possession. This distribution was not monitored, recorded or confirmed.

> * * *

> On March 14th, 2013 at approximately 1400 hours I spoke to the CI that provided the 3 bags of heroin to Officer Adams and I on March 5th. This CI stated that it had received a call from Rell stating that they were at "Puma['s]" and open for business. The CI stated he told them that it would be by later to pick up. The CI advised that Puma lives at 39 in Twin Oaks Terrace.

> * * *

> On 03/05/13 Det. Merchand of the Burlington Police Department and I met with CS who informed us about a group of individuals selling heroin in the Greater Burlington area, nicknamed "90" and "Rell." [description of Det. Merchand's investigation] CS advised "90" and "Rell" were staying at a residence on Mayo Road in Colchester. Based on the description provided by CS the house was identified as 354 Mayo Road. [description of car Det. Merchand saw in driveway of Mayo Road residence].

*Id.* ¶¶ 6, 12, 13.

The government contends in its Opposition that Officer Nease's references to the "Cooperating Individual," the "CI" and the "CS" refer to the same individual, however,

4

no evidence was presented to support that conclusion. As Defendant points out, on its face, the search warrant affidavit appears to treat them as at least two different individuals, neither of whom is described as a reliable source of information.

The remainder of the search warrant affidavit contains information derived from other law enforcement officers. Most of the information relates to law enforcement's investigation of drug activity in the greater Burlington area with no reference to or connection with either Joshua Puma or 39 Twin Oaks. With regard to Defendant, the search warrant affidavit recites that he was found to have "an active arrest warrant in the State of Pennsylvania for a Parole Violation with Intent to Distribute Controlled Substances and the State of Pennsylvania is willing to extradite him." *Id.* ¶ 14. The affidavit further recites that Defendant's parole officer advised law enforcement that Defendant was "a violent offender and has been known to obtain firearms in the past." *Id.* ¶ 15.

> To support a no knock, nighttime search warrant, Officer Nease averred:
>
> I am requesting the limitation of the search warrant to be served between the hours of 6 am to 10 pm be lifted. Law Enforcement personnel will not be able to serve this warrant with this restriction on this date. I am also requesting a "No Knock" exception for this warrant as the individuals that are the subject of this investigation have a violent history outside of the State of Vermont and have had ready access to firearms. The information providers in this case have not observed any firearms to date but these individuals have had contact with LE officers on 3 different occasions and continue to try and hide their identity and drug network[.]

(Doc. 45-1 ¶ 18.)

The search warrant affidavit contains specific, albeit limited, information regarding potential drug related activity at 39 Twin Oaks. It describes a March 5, 2013 drug overdose at that address to which law enforcement responded. In the course of their response, officers noted "a smell of burnt marijuana and . . . small plastic baggies on the floor commonly used to package illegal drugs." *Id.* ¶ 7. Mr. Puma was present at the residence and advised that an identified individual had overdosed on heroin in a back bedroom. Mr. Puma ultimately consented to a search of the residence. "The search of

the residence uncovered only various drug paraphernalia, to include baggies with residue of white powder or green leafy substances." *Id.* On a kitchen table, law enforcement found an empty prescription bottle with what appeared to be marijuana shake. The drug paraphernalia was seized and destroyed.

The search warrant affidavit further recites that, on March 11, 2013, law enforcement responded to an overdose in the area of 41-48 Twin Oaks Terrace. The identified male who overdosed was transported to and stabilized at a local hospital where he advised that he had purchased that evening a bundle (10 bags) of heroin from 39 Twin Oaks, which he knew to be the residence of Joshua Puma.

On March 14, 2013, the affidavit states that an unnamed "neighbor" called law enforcement and advised that "the Puma residence was receiving an inordinate amount of traffic and that Mr. Puma was selling drugs still." *Id.* ¶ 16. No basis for this knowledge is provided. However, law enforcement conducted its own surveillance of 39 Twin Oaks on March 14, 2013 and "observed what they suspect to be 4 drug transactions. Each time a black female would leave the residence of Josh Puma." *Id.* ¶ 17. The affidavit describes these alleged drug transactions as follows: "One occasion this female drove to the Fitness edge and met with a secondary car for a brief moment and split company. This same scenario occurred at a gas station on Kennedy Drive, the same scenario at the McDonald[']s restaurant on Williston Road (although at this location the [sic] also purchased food), and lastly one occurred right in the parking lot of 39 Twin Oaks Terrace[.]" *Id.*

### C. Inaccuracies in the Search Warrant Affidavit.

The government concedes that the surveillance information set forth in the search warrant affidavit is incorrect in three respects. First, DEA Agent Chetwynd, who was conducting the surveillance, could not see Joshua Puma's front door and thus he did not see an African-American female leaving it, although she emerged from a hallway that led to two apartments one of which was unit 39. Second, Agent Chetwynd saw the African-American woman leave from the building on at least two occasions, but he did not witness her leaving on four occasions as set forth in the affidavit. And third, law

enforcement witnessed no hand-to-hand contact to support the four alleged "suspected drug transactions." The parties have further stipulated that Agent Chetwynd saw "several persons come to and leave from the door [to the hallway to 39 Twin Oaks] making visits of short durations" and concluded that this traffic likely came from unit 39 based upon the path of travel and the lights turning on in the unit during these visits. (Gov't Ex. 2 at 1.)[2]

### D.    Execution of the Search Warrant and Questioning of Defendant.

Upon entering the residence to execute the search warrant, law enforcement discovered Defendant in a back room of the apartment in bed with a woman and arrested him on the outstanding Pennsylvania arrest warrant. Defendant initially asked for a jacket hanging in the closet, but stated that it was not his as law enforcement retrieved it. Located in one of the jacket's pockets were multiple bundles of suspected heroin. A search of the room also revealed several hundred bags of suspected heroin in a trash can next to the bed in which Defendant was located.

Defendant was transported to the South Burlington Police Station, placed in an interview room, and advised that he was under arrest. Prior to reading Defendant his *Miranda* rights, Detective Daniel Merchand advised Defendant of his ongoing investigation concerning individuals who were transporting narcotics from Brooklyn to Vermont. Detective Merchand also discussed Defendant's outstanding Pennsylvania arrest warrant, explained the federal sentencing guidelines, and advised Defendant that he was seeking information about the source of the narcotics in Brooklyn. He then read Defendant his *Miranda* warnings and asked Defendant whether he wanted to talk. Defendant responded in the negative. After confirming that Defendant did not want to

---

[2] This evidence was not included in the search warrant affidavit and thus cannot be considered as part of a probable cause analysis. *See United States v. Voustianiouk*, 685 F.3d 206, 214 (2d Cir. 2012) ("The Supreme Court, however, has made clear that the mere fact that officials were in possession of evidence that *would have* provided probable cause for the search that they ultimately conducted is irrelevant in determining whether a search violated the Fourth Amendment of the Constitution."); *see also Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 565 n.8 (1971) ("Under the cases of the Court, an otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate") (citations omitted).

talk, Detective Merchand continued to speak with Defendant, informing him that he would be brought to a correctional facility and transported to court in the morning and asking for Defendant's confirmation of this information by asking if that was "alright?" (Gov't Ex. 3 at 4.) Defendant responded as follows: "Um-hum. I mean, I'll say - you know, I just want a lawyer and all that but, you know, you can still talk to me without one here." *Id.* at 5. Thereafter, Detective Merchand asked Defendant a number of questions, which Defendant answered. The following exchange then ensued:

| Defendant: | Yeah. What's up though like? |
|---|---|
| Det. Merchand: | Well, I mean – I mean, the thing is . . . |
| Defendant: | Just keep it real . . . |
| Det. Merchand: | What's that? |
| Defendant: | Keep it real with me . . . about. |
| Det. Merchand: | Keep it real? I mean, you got problems. You know, I mean, we know you've been coming up here. We know you've been selling heroin. I have a good idea where you're already getting it from, where it's coming from down in the City. |
| Defendant: | Who is that? |
| Det. Merchand: | I'm not going to tell you that. Man, I'm . . . |
| Defendant: | Hey look, I wasn't coming up here . . . . I was up here this time. This is my second time coming up here, to be honest with you. |

*Id.* at 7. The government does not seek to use Defendant's pre-*Miranda* statements in its case-in-chief at trial.

## II. Conclusions of Law and Analysis.

### A. Standard of Review.

"It is well established that the burden of production and persuasion generally rest upon the movant in a suppression hearing." *United States v. Arboleda*, 633 F.2d 985, 989

8

(2d Cir. 1980) (internal quotation marks omitted). "[O]nce [the defendant] establishes a basis for his motion, the burden rests upon the [g]overnment to prove, by a preponderance of the evidence, the legality of the actions of its officers." *United States v. Hendrickson*, 2012 WL 6567588, at *3 (D. Vt. Dec. 17, 2012) (quoting *United States v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004)); *United States v. Breckenridge*, 400 F. Supp. 2d 434, 437 (D. Conn. 2005) ("In a motion to suppress physical evidence, the burden of proof is initially on the defendant. Once the defendant has established some factual basis for the motion, the burden shifts to the government to show that the search was lawful.") (citations omitted); *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010) (same); *see also United States v. Townsend*, 371 F. App'x 122, 123-24 (2d Cir. 2010) ("At a suppression hearing, the government bears the burden of showing, by a preponderance of the evidence, that the evidence was lawfully obtained."). "[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

## B.    Motion to Suppress Evidence.

### 1.    Lack of Particularity.

"The Fourth Amendment's requirements regarding search warrants are not 'formalities.'" *United States v. Voustianiouk*, 685 F.3d 206, 210 (2d Cir. 2012) (quoting *McDonald v. United States*, 335 U.S. 451, 455 (1948)). A search warrant violates the Fourth Amendment if it fails to describe the place to be searched with "particularity." *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) (citing U.S. Const. amend IV which requires that search warrants "particularly describ[e] the place to be searched."). A "warrant containing 'partial misdescriptions of the place to be searched' satisfies the Fourth Amendment 'so long as the officer executing the warrant could ascertain and identify the target of the search with no reasonable probability of searching another premises in error.'" *United States v. Martin*, 157 F.3d 46, 52 (2d Cir. 1998) (quoting *Velardi v. Walsh*, 40 F.3d 569, 576 (2d Cir. 1994)). As the Second Circuit has explained:

[w]arrants have been upheld despite "technical errors," such as an incorrect street address, when the possibility of actual error is eliminated by other information, whether it be a detailed physical description in the warrant itself, supplemental information from an appended affidavit, or knowledge of the executing agent derived from personal surveillance of the location to be searched.

*Velardi*, 40 F.3d at 576 & n.3 (collecting cases).

The government points out that the search warrant affidavit correctly identified the place to be searched as being located in the City of South Burlington. However, a lack of particularity cannot be cured by a particularized search warrant affidavit where, as here, it is neither incorporated into nor appended to the warrant. *See United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010) (holding that courts "may no longer rely on unincorporated, unattached supporting documents to cure an otherwise defective search warrant"); *Velardi*, 40 F.3d at 576 (requiring an "appended affidavit" if the affidavit is to serve as supplemental information).

Likewise, although it is quite possible that law enforcement officers executing the warrant knew the city or town in which the residence to be searched was located, the government presented no evidence to this effect. Instead, the only evidence presented came from members of the surveillance team who did not participate in the execution of the warrant.[3] *See Velardi*, 40 F.3d at 576 (explaining that the "executing agent" must have "personal" knowledge derived from "surveillance of the location to be searched" to cure an otherwise deficient search warrant); *United States v. Bonner*, 808 F.2d 864, 866-67 (1st Cir. 1986) (holding warrant was sufficiently particularized despite omitting the address because the "agents, having previously conducted the surveillance, knew exactly which house they wanted to search").

The government argues that the "39 Twin Oaks" within the "Twin Oaks Terraces" is a unique address and contends that Defendant has failed to identify any other address

---

[3] Detective Merchand testified that he helped out at the completion of the search warrant but he did not read the search warrant or the search warrant affidavit. There is, moreover, no evidence that he was present when law enforcement made entry into the residence and seized evidence therein.

with which it could be confused.[4] However, the government presented no evidence to support a conclusion that the address is, in fact, unique. Instead, it makes this unsupported allegation in its Opposition. *See Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009) ("An attorney's unsworn statements in a brief are not evidence."); *Giannullo v. City of New York*, 322 F.3d 139, 142 (2d Cir. 2003) (stating that a memorandum of law "is not evidence at all").

Finally, the government contends the warrant was sufficiently particular because the description of the place to be searched was otherwise accurate. Assuming *arguendo* that a search warrant that omits the town or city in which the residence is located may be cured in this fashion,[5] in this case, the court cannot find that the description of the place to be searched was otherwise accurate. The warrant incorrectly describes the location of unit 39 as being in the center of the multi-unit building; inaccurately describes the building as being the "second building" in Twin Oaks Terraces; and describes the building's color in a manner that differs from the government's surveillance photograph of it. The description of the place to be searched thus contained inaccurate or confusing

---

[4] Neither party briefed the issue of who bears the burden of establishing that an address is or is not unique. Arguably, the party drafting the search warrant is in the best position and has the greatest incentive to proffer this evidence to establish law enforcement acted lawfully. Some state courts, however, have placed this burden on the defendant. *See, e.g., State v. Fisher*, 639 P.2d 743, 747 (Wash. 1982) (en banc) (holding that the burden of proof is on the defendant to show that the property searched reasonably could have been confused with another property); *People v. Fragoso*, 386 N.E.2d 409, 415 (Ill. App. Ct. 1979) (holding that, under the U.S. Constitution, "[d]efendants had the burden of establishing the lack of particularity of description in the warrant yet they have never attempted to establish the existence of another 3445 West Diversey in Chicago, in Cook County, or, indeed, anywhere in the State"). Here, the court need not reach the issue because neither party proffered any evidence or requested the court to take judicial notice of any facts that would establish that the address in question is or is not unique.

[5] The government cites *United States v. Avarello*, 592 F.2d 1339, 1344 (5th Cir. 1979) for the proposition that the omission of the city or town in which the place to be searched is located need not be fatal to a search warrant. In *Avarello*, the Fifth Circuit upheld a search warrant that erroneously identified the dwelling's location as Dallas rather than Fort Worth. It observed, however, that although the description in the search warrant was inaccurate, the warrant's caption provided the full and accurate address on the face of the warrant. *Id.* Moreover, the warrant provided "thorough physical descriptions of the building and of the individual apartment." *Id.* at 1344 & n.8.

information beyond its omission of the city or town in which the residence to be searched was located.

In summary, the search warrant's description of the place to be searched did not ensure that those executing it "could ascertain and identify the target of the search with no reasonable probability of searching another premises in error." *Martin*, 157 F.3d at 52 (internal quotation marks omitted). It was therefore, on its face, invalid and cannot be the basis for a lawful search and seizure unless the good faith exception applies. *See Massachusetts v. Sheppard*, 468 U.S. 981, 988 & n.5 (1984) ("[A] search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional.").

## 2. The Good Faith Exception.

The government asks the court to find that law enforcement relied in good faith on the search warrant, and thus suppression of the evidence obtained through its execution is not warranted. "As the Supreme Court recently reminded courts, suppression is 'our last resort, not our first impulse' in dealing with violations of the Fourth Amendment." *United States v. Clark*, 638 F.3d 89, 99 (2d Cir. 2011) (quoting *Herring v. United States*, 555 U.S. 135, 140 (2009)). Accordingly, "the exclusionary rule barring illegally obtained evidence from the courtroom does not apply to evidence seized 'in objectively reasonable reliance on' a warrant issued by a detached and neutral . . . judge, even where the warrant is subsequently deemed invalid." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)). However, the good faith exception does not apply "'where the warrant is so facially deficient [such as by failing to particularize the place to be searched or the things to be seized] that reliance upon it is unreasonable." *Id.* (quoting *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992)). "The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance." *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992); *See also Illinois v. Krull*, 480 U.S. 340, 355 (1987) ("[T]he standard of reasonableness . . . is an objective one; the standard does not turn on the subjective good faith of the individual officers"). "In assessing whether [the government] has carried that

burden, [the court is] mindful that, in *Leon*, the Supreme Court strongly signaled that most searches conducted pursuant to a warrant would likely fall within its protection." *Clark*, 638 F.3d at 100.

In *Clark*, the Second Circuit explained that "*Massachusetts v. Sheppard*, 468 U.S. 981 (1984), and *Groh v. Ramirez*, 540 U.S. 551 (2004), illustrate [the circumstances in which] a warrant is facially defective" under *Leon*. *Clark*, 638 F.3d at 102. In *Sheppard*, the Court "upheld a lower court determination that 'the warrant was constitutionally defective because the description [of items to be seized] in the warrant was completely inaccurate and the warrant did not incorporate the description contained in the affidavit.'" *Id.* (quoting *Sheppard*, 468 U.S. at 988 n.5). The Court concluded, however, that reliance was reasonable because law enforcement had advised the issuing judge of the defect, who had represented that "the necessary changes would be made," but then failed to do so unbeknownst to the officer. *Sheppard*, 468 U.S. at 989. In *Groh*, the Court held that the good faith exception was unavailable because "the warrant did not describe the items to be seized *at all*." *Groh*, 540 U.S. at 558, 565. The warrant at issue in *Groh* mistakenly described the dwelling to be searched in the place reserved for the items to be seized. *Id.* at 558. Accordingly, the "warrant did not simply omit a few items from a list of many to be seized, or misdescribe a few of several items." *Id.* The Court stressed that "even a cursory reading of the warrant in this case—perhaps just a simple glance—would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal." *Id.* at 564.

The search warrant here contains a defect of similar magnitude. Even a cursory reading of it would have revealed that it failed to include the city or town in which the residence to be searched was located. This is more than a mere "technical error[,]" *Velardi*, 40 F.3d at 576; it is "a glaring deficiency that any reasonable police officer would have known was constitutionally fatal." *Groh*, 540 U.S. at 564. "[W]hile courts must sometimes 'allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants," *Voustianiouk*, 685 F.3d at 217 (citation omitted), "the Supreme Court has explicitly

13

rejected the need for such deference when, as was the case here, no 'sort of exigency existed when [an official] drafted the affidavit, the warrant application, and the warrant, or when he conducted the search." *Id.* (quoting *Groh*, 540 U.S. at 565 n.9). Here, "[t]hese officers had ample opportunity to detain their suspect and obtain a new warrant." *Id.*

The government has presented no evidence that would allow the court to conclude that law enforcement's reliance on the warrant was objectively reasonable. The court is thus confronted with a facially deficient warrant upon which no law enforcement officer could reasonably rely. *See Martin*, 157 F.3d at 52; *cf. United States v. Garza*, 980 F.2d 546, 552 (9th Cir. 1992) (declining to suppress evidence despite incorrect address where, *inter alia*, law enforcement "ran the license plate numbers of two vehicles in the driveway" to confirm that they were at the correct dwelling); *United States v. Thomas*, 263 F.3d 805, 809 (8th Cir. 2001) (holding that although the search warrant's incorrect address failed to satisfy the particularity requirement, suppression was inappropriate under *Leon* because the officer that "obtained and executed the warrant" had "personal knowledge of the location to be searched"). Because the government bears the burden of establishing that the good faith exception applies, *see Clark*, 638 F.3d at 100, and because it has not sustained that burden, Defendant's motion to suppress evidence based upon a lack of particularity must be GRANTED.

## C. Defendant's Request for a *Franks* Hearing.

As an additional and alternative ground for challenging the search warrant, Defendant argues that the warrant was not supported by probable cause because: (1) it contains material misstatements of fact that entitle Defendant to a hearing under *Franks v. Delaware* to establish whether law enforcement intentionally or recklessly mislead the judge who issued the warrant; and (2) in the absence of the inaccurate material facts, the warrant lacked probable cause because the reliability of the confidential informants was not established. In light of the court's decision regarding the challenge to the search warrant on the basis of particularity, the request for a *Franks* hearing is DENIED AS

MOOT.  However, in order to facilitate appellate review, the court addresses whether probable cause for the warrant existed in the absence of the challenged facts.

To secure a *Franks* hearing, Defendant must make a "'substantial preliminary showing' that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause." *Falso*, 544 F.3d at 125 (quoting *Franks*, 438 U.S. at 155-56, 170-71).  Here, Defendant points out that the search warrant affidavit inaccurately states that the surveillance team observed a "black female" leave the door to Mr. Puma's residence to engage in four suspected drug transactions.  The government concedes that the surveillance team could not see the front door to unit 39, saw the woman emerge "at least twice," not four times, and did not witness any hand-to-hand drug transactions.  The government argues that, even if the court determines that this information was intentionally or recklessly provided, it was not necessary to establish probable cause. Although it is a close question, the court agrees.

In the absence of the challenged facts, Defendant points out that the confidential informant(s) identified in the search warrant affidavit have not been shown to be reliable. "Although discredited as a rigid two-pronged test, an informant's basis of knowledge and veracity remain important factors in a 'totality of the circumstances' analysis." *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (citing *Illinois v. Gates*, 462 U.S. 213, 230-39 (1983)).  At the same time, "it is improper to discount an informant's information simply because he has no proven record of truthfulness or accuracy," because an informant's "veracity can be shown in other ways." *Id.* at 719.  For example, "'a face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster.'" *Id.* (quoting *United States v. Salazar*, 945 F.2d 47, 50-51 (2d Cir. 1991)).

"[P]robable cause is not defeated because the informant erred, or even lied, in his description of events." *United States v. Smith*, 9 F.3d 1007, 1014 (2d Cir. 1993).  On the other hand, mere conclusory statements will not suffice. *See United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) (explaining that "it does not suffice to provide 'a mere

conclusory statement that gives the [factfinder] virtually no basis at all for making a judgment regarding probable cause.'") (quoting *Gates*, 462 U.S. at 239); *United States v. Ritter*, 416 F.3d 256, 263 (3d Cir. 2005) ("Where corroboration or independent investigation after receipt of an anonymous tip is lacking—and thus the predictive value of the tip goes untested before a warrant is issued—courts have found officers' subsequent reliance on the warrant unreasonable.").

Courts recognize that an individual's interest in "obtaining leniency creates a strong motive to supply accurate information," although "a criminal informer is less reliable than an innocent bystander with no apparent motive to falsify." *United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004) (internal quotation marks and alteration omitted). "In addition to considering an informant's veracity, reliability, and basis of knowledge, . . . [courts] also evaluate whether the information an informant provides is corroborated by independent police investigation, because an informant who is right about some facts is more likely to be right about others." *Id.* (citation omitted).

The search warrant affidavit at issue here provides scant information from which the reliability of the confidential informant(s) can be assessed. However, it nonetheless contains some corroboration of certain information provided by the confidential informant(s) including that, on the day of the warrant application, Defendant called that same day and advised that he was at Mr. Puma's and "open for business." (Doc. 45-1 ¶ 12.) The confidential informant provided law enforcement with information that supported a conclusion that it knew Defendant and his involvement in a previous traffic stop and was aware of the overdose that took place at Joshua Puma's residence on March 5, 2013. Personal knowledge regarding at least one recent occurrence at Mr. Puma's residence lends some support for a conclusion that the confidential informant was familiar with activities taking place therein. *See Clark*, 638 F.3d at 98 ("Partial corroboration of an informant is a circumstance that, on totality review, may allow a judicial officer to credit the informant's whole account.").

Viewed in isolation, the affidavit's recitation of information from confidential informant(s) would not establish probable cause. However, these statements must be

considered as part of the "totality of the circumstances" presented in the search warrant affidavit. *See id.* at 93 (court must consider the affidavit as a whole and determine whether it provided the issuing judge with "'a substantial basis' for making the requisite probable cause determination") (quoting *Gates*, 462 U.S. at 238).

In addition to the information from the confidential informant(s), the search warrant affidavit states that, nine days prior to the warrant application, law enforcement responded to Mr. Puma's residence at 39 Twin Oaks Terrace to treat an identified individual overdosing on heroin. During this incident, Mr. Puma admitted that the individual had consumed heroin. Law enforcement discovered suspected drug paraphernalia and evidence of illegal drug use within Mr. Puma's residence. Three days prior to the warrant application, law enforcement responded to another overdose in the same vicinity. The overdosing individual, who is identified in the affidavit, admitted to purchasing ten bags of heroin from a person at Mr. Puma's residence which he identified as unit 39 Twin Oaks. *See United States v. Harris*, 403 U.S. 573, 583 (1971) (plurality opinion) (explaining that "[a]dmissions of crime . . . carry their own indicia of credibility-sufficient at least to support a finding of probable cause to search" because "[p]eople do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions"); *United States v. Rowell*, 903 F.2d 899, 903 (2d Cir. 1990) (holding that the reliability of an informant was established by a statement against his penal interest "that he had personally purchased cocaine from [the defendant]").

On the day of the warrant application, a neighbor contacted the South Burlington Police Department to alert them that Mr. Puma's residence "was receiving an inordinate amount of traffic and that Mr. Puma was selling drugs still." (Doc. 45-1 ¶ 6.) Although the neighbor's citizen status and apparent proximity to the residence support the neighbor's reliability and veracity, *see Caldarola v. Calabrese*, 298 F.3d 156, 166 (2d Cir. 2002) (recognizing the "'peculiar likelihood of accuracy' of information provided by private citizens"), this is not the case of an "identified private citizen informant[]," where veracity is "generally presumed." *United States v. Elmore*, 482 F.3d 172, 180 (2d Cir. 2007). However, here law enforcement corroborated the neighbor's observations by

noting activity at Mr. Puma's residence which appeared to be consistent with drug transactions.

In order to determine probable cause, a judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. "[T]he task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the [issuing judge] 'a substantial basis' for making the requisite probable cause determination." *Clark*, 638 F.3d at 93 (quoting *Gates*, 462 U.S. at 238). Here, even without the material misstatements of fact, the search warrant was supported by probable cause. *See United States v. Lueth*, 807 F.2d 719, 726 (8th Cir. 1986) (holding a warrant is invalid *"only* if the affidavit as supplemented by the omitted material *could not* have supported the existence of probable cause."); *see also Garza*, 980 F.2d at 551 (refusing to suppress evidence when, "[e]ven if the misstatements were corrected and the omissions supplied, the affidavit would furnish probable cause for issuance of the warrant"); *United States v. Thomas*, 2012 WL 4892850, at *3-4 (D. Vt. Oct. 15, 2012) ( denying motion to suppress because "omitted information would not have materially affected the probable cause determination"). A *Franks* hearing is thus not warranted.

**D.    No Knock, Nighttime Warrant.**

As an alternative and additional argument, Defendant contends that the evidence should be suppressed because the search warrant affidavit did not support a no knock nighttime warrant. Again, the court examines this issue to facilitate appellate review.

"Both the Supreme Court and the Second Circuit have clearly stated that the exclusionary rule does not apply to any evidence seized as the result of a violation of either the Fourth Amendment 'knock and announce' rule or 18 U.S.C. § 3109." *United States v. Cooper*, 2011 WL 6180035, at *4 (D. Vt. Dec. 13, 2011) (citing *Hudson v. Michigan*, 547 U.S. 586, 594 (2006); *United States v. Acosta*, 502 F.3d 54, 61 (2d Cir. 2007)). Correspondingly, no special showing for a nighttime search is required "other than a showing that the contraband is likely to be on the property or person to be searched

18

at that time." *Gooding v. United States*, 416 U.S. 430, 458 (1974). In other words, "probable cause for the warrant itself [is] all that [is] necessary for a nighttime search."[6] *Id.* at 457. Because the affidavit supplied probable cause for issuing the search warrant, Defendant's motion to suppress on the basis of the no knock, nighttime search warrant must be DENIED.

### E. Motion to Suppress Statements – *Miranda* Violations.

Defendant does not seeks suppression of his post-arrest statements as fruits of an unlawful search and seizure under *Wong Sun v. United States*, 371 U.S. 471 (1963). Presumably this is because, at the time of his arrest, Defendant was the subject of an outstanding arrest warrant from Pennsylvania. Instead, he contends that after receiving *Miranda* warnings, he invoked his right to silence and to counsel and Detective Merchand continued to question him thereafter without obtaining a valid waiver of his *Miranda* rights. The government does not intend to introduce any of Defendant's pre-*Miranda* statements at trial.[7] At issue is whether Defendant unambiguously invoked his *Miranda* rights, and validly waived them thereafter.

---

[6] This may have been a closer question under Vermont law. Vermont Rule of Criminal Procedure 41(d)(5)(A)(ii) provides that search warrants shall be executed "between the hours of 6:00 A.M. and 10:00 P.M. unless the judicial officer for reasonable cause shown authorizes execution at other times." Interpreting this statute, the Vermont Supreme Court held that "[a] nighttime search is justified where there is information presented in the search warrant affidavit that, absent a nighttime search, there is a danger that the evidence sought will be disposed of." *State v. Weiss*, 587 A.2d 73, 76 (1990) (internal quotation marks omitted). Here, the search warrant application requested the nighttime warrant because the application was completed shortly before 10:00 p.m. and law enforcement could not otherwise execute it that same evening. It is doubtful whether this timing constraint would satisfy the standard set forth in *Weiss*.

[7] As the government does not seek to introduce Defendant's pre-*Miranda* statements at trial, the court need not address the issue further. However, because in both this case, and in the companion case of *United States v. Williams*, Detective Merchand engaged each defendant in a conversation prior to reading *Miranda* warnings in order to explain the results of his investigation, the sentencing guidelines, and other matters beyond mere booking questions, the court notes that this practice has the potential to constitute custodial interrogation if it ventures too far. "[C]ourts have generally rejected claims . . . that disclosure of . . . inculpatory evidence possessed by the police, without more, constitutes 'interrogation' under *Innis*." *Acosta v. Artuz*, 575 F.3d 177, 191 (2d Cir. 2009) (collecting cases); *see also Easley v. Frey*, 433 F.3d 969, 974 (7th Cir. 2006) (holding that state court did not act unreasonably in rejecting claim that officer's

"[A]n accused who wants to invoke his or her right to remain silent must do so unambiguously." *United States v. Oehne*, 698 F.3d 119, 123 (2d Cir. 2012) (citing *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010)). Generally, once a suspect invokes the right to remain silent, law enforcement may not interrogate the suspect "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 485 (1981). *Miranda*'s bar on questioning applies to both express questioning and its "functional equivalent," which includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291-92, 301 (1980) (footnote omitted).

Here, Defendant unambiguously invoked his right to remain silent. After acknowledging that Defendant invoked this right, Detective Merchand briefly advised Defendant of the events that would occur thereafter. These statements did not violate *Miranda* because they were neither express questions nor their functional equivalent. *See Id.* at 301 (holding that statements "normally attendant to arrest and custody" are not interrogation under *Miranda*). Defendant does not argue to the contrary. After Detective Merchand made these statements, Defendant stated: "I just want a lawyer and all that but, you know, you can still talk to me without one here." (Gov't Ex. 3 at 5.) This was not the type of "routine" statement, "such as a request for a drink of water or a request to use a telephone," held not to "'initiate' a conversation in the sense in which that word was used in *Edwards*." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983) (plurality opinion) (holding defendant "'initiated' further conversation" by asking "Well, what is going to

---

"matter-of-fact communication of the evidence against [defendant] and the potential punishment he faced" constituted interrogation); *Enoch v. Gramley*, 70 F.3d 1490, 1500 (7th Cir. 1995) (holding that incriminating statements were not result of interrogation where "the police identif[ied] the victim to the suspect and briefly stat[ed] the evidence against him"); *but cf. United States v. Szymaniak*, 934 F.2d 434, 436-37, 439 (2d Cir. 1991) (holding that interrogation occurred where officer visited defendant "three or four times" to confront him with inculpatory information and "request [ed] that he give [the police] a statement").

happen to me now?"). Instead, Defendant's statement "evinced a willingness and a desire for a generalized discussion about the investigation." *Id.* at 1045-46.

Defendant contends that Detective Merchand should have clarified whether Defendant wanted to remain silent and whether he was simply willing to allow Detective Merchand to continue to "talk" to him, or whether Defendant was willing to answer questions as well. Both the Supreme Court and the Second Circuit have rejected this approach, holding that law enforcement has no duty to ask clarifying questions. *See Berghuis*, 130 S. Ct. at 2259-60 (holding that "[i]f an accused makes a statement concerning [the right to silence] 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights.") (quoting *Davis v. United States*, 512 U.S. 452, 461-62 (1994)); *United States v. Plugh*, 648 F.3d 118, 124-25 (2d Cir. 2011) (holding no duty to clarify whether a suspect was waiving his *Miranda* rights after ambiguous invocation in light of *Berghuis*).

Defendant makes a similar argument with regard to his invocation of the right to counsel. Like the right to remain silent, a defendant "must unambiguously request counsel." *Davis*, 512 U.S. at 459. Defendant concedes that his statements were likely an "ambiguous invocation" of the right to counsel because he simultaneously stated that he wanted a lawyer and that Detective Merchand could still talk to him without one present. (Doc. 71 at 4.) The court agrees that Defendant's invocation of the right to counsel was, at best, equivocal. *See United States v. Brown*, 287 F.3d 965, 972-73 (10th Cir. 2002) (holding that defendant's request was ambiguous where he simultaneously stated that he wanted a lawyer present for questioning but would answer questions without one). Defendant nonetheless contends that Detective Merchand had an obligation to clarify Defendant's intent. Again, the courts reject this approach. "'[I]f an accused makes a statement concerning the right to counsel that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights.'" *Plugh*, 648 F.3d at 123 (quoting *Berghuis*, 130 S. Ct. at 2259-60). As a result, although it would have been

"good police practice for [Detective Merchand] to clarify whether or not [Defendant] actually want[ed] an attorney," he was not obligated to do so. *Davis*, 512 U.S. at 461.

The government, however, retains the burden of showing a valid *Miranda* waiver. *See United States v. Murphy*, 703 F.3d 182, 192 (2d Cir. 2012) ("The Government bears the burden of proving by a preponderance of evidence that a valid waiver occurred"). If the defendant initiates further communication, the court must therefore consider "whether a valid waiver of the . . . right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Edwards*, 451 U.S. at 486 n.9; *see also Bradshaw*, 462 U.S. at 1045 (plurality opinion) (explaining that the initiation and waiver "inquiries are separate, and clarity of application is not gained by melding them together"). "To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995).

In this case, Defendant received *Miranda* warnings, invoked his right to remain silent, mentioned he wanted a lawyer, and thereafter advised Detective Merchand that he could continue to talk to him. These facts reveal that Defendant understood his *Miranda* rights and how to exercise them. *See Pickens v. Gibson*, 206 F.3d 988, 995 (10th Cir. 2000) ("[Defendant's] initial refusal to make a statement and his request for an attorney indicate he understood both the nature and consequences of his right to remain silent and his right to counsel.") (internal quotation marks omitted). They also reveal that, notwithstanding his *Miranda* rights, Defendant was willing to initiate conversation with Detective Merchand. In the brief discussion that followed, Defendant both asked and answered questions. He did so in a manner that evinced his desire to obtain information so as to assess the extent of his potential culpability, asking Detective Merchand "what's up?" and telling him to "keep it real." (Gov't Ex. 3 at 7.) In addition to asking questions, Defendant freely answered questions, providing specifics about his background but

becoming more evasive when Detective Merchand discussed the nature and duration of Defendant's involvement in drug activity in the Burlington area. The exchange was low key, conversational in nature, and clearly voluntary.

"Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.* at 2262; *see also Butler*, 441 U.S. at 373 ("[W]aiver can be . . . inferred from the actions and words of the person interrogated."). Under such circumstances, there is no need to re-read a defendant *Miranda* warnings in order to establish a valid waiver. *See United States v. Velasquez*, 885 F.2d 1076, 1087 (3d Cir. 1989) (holding valid waiver when defendant initiated conversation thirty minutes after invoking right to counsel despite failure to re-read *Miranda* rights). Here, shortly after receiving *Miranda* warnings, Defendant clearly engaged in a "'course of conduct indicating waiver' of the right to remain silent." *Berghuis*, 130 S. Ct. at 2263 (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

Based upon the totality of the circumstances, the government has established by a preponderance of the evidence that Defendant waived his *Miranda* rights. *See Murphy*, 703 F.3d at 192. Defendant's motion to suppress his statements must therefore be DENIED.

## CONCLUSION

For the reasons stated above, the court GRANTS Defendant's motion to suppress physical evidence, DENIES Defendant's request for a *Franks* hearing as moot, and DENIES Defendant's motion to suppress statements. (Docs. 36 & 37.)
SO ORDERED.

Dated at Rutland, in the District of Vermont, this 24ᵗʰ day of October, 2013.

Christina Reiss, Chief Judge
United States District Court